We'll hear argument next today in Case 12-682, Schuette v. the Coalition to Defend Affirmative Action. Mr. Bursch? Thank you, Mr. Chief Justice, and may it please the Court. The issue in this case is whether a Michigan constitutional provision requiring equal treatment violates equal protection. And for two reasons, the answer is no. First, unlike the laws at issue in Hunter and Seattle, Section 26 does not repeal an anti-discrimination law. Instead, it repeals preferences, and thus it's an impediment to preferential treatment, not equal treatment. Seattle had nothing to do with an anti-discrimination law. It had to do with a remedy, de facto segregation. Why isn't this identical to Seattle? Justice Sotomayor, it's not identical because of the remedy issue. In Seattle, they were trying to create, in the Court's words, equal educational opportunity by imposing a remedy that would result in equality in the schools. You don't think that the proponents of affirmative action are attempting to do the same thing? One of the bill sponsors here said that this constitutional amendment will bring back desegregation in Michigan, and it appears to have done just that. Well, there's two points to that question, and I'll address them both. First, on the merits. Under Grutter, the point of preferences in university admissions cannot be solely the benefit of the minority, because under Grutter, it's supposed to benefit the campus as a whole, through diversity, which we think is a laudable goal. It's a forward-looking action, not a backward-looking action, to remedy past discrimination. And we know that because under Grutter, you can use preferences, whether or not there's  But with respect to your point about the University of Michigan and what has or has not happened here, two thoughts on that. First, we have the statistics that we discuss in our reply brief, where it's not clear that the diversity on Michigan's campus has gone down. But our main point on that is not those numbers, but the fact that there are other things that the University of Michigan could be doing to achieve diversity in race-neutral ways. For example, we know that in Grutter, all of the social scientists had pointed out to the fact that all of those efforts had failed. It's one of the reasons why the, I think it was the law school plan in Michigan was upheld. Well, there's social science evidence that goes both ways. But I want to focus on the University of Michigan, because there's two things that they could be doing right now that would get them closer to the race-neutral goal. The first thing is that they could eliminate alumni preferences. Other schools have done that. They have not. That's certainly one way that tilts the playing field away from underrepresented minorities. The other one, and this is really important, is the focus on socioeconomic It's always wonderful for minorities that they finally get in, they finally have children, and now you're going to do away for that preference for them. It seems that the game post keeps changing every few years for minorities. Given the makeup of Michigan's alumni right now, certainly that playing field would be tilted the other way. The other thing that we press is socioeconomic diversity. And at the University of Michigan, there was a stat in the Wall Street Journal just two days ago that if you measure that by Pell Grants, the number of students who are eligible for those, at the University of Michigan, the number of students who have Pell Grants is half what it is at more progressive institutions like Berkeley and the University of Texas at Austin. So the University of Michigan could be trying harder. But our point isn't to get into a debate about whether preferences are a good or bad thing. The question is whether the people of Michigan had the choice, through the democratic process, to accept this Court's invitation in Grutter to try race-neutral means. JUSTICE KENNEDY While you're on Seattle, can you — I have difficulty distinguishing Seattle. One factual difference is that there was a school board there, a directly elected school board elected for a short term of years. Here's — there's a board of trustees. Is that — is that the distinguish — a distinguishing factor in the case in which a principled distinction could be made? MR. CLEMENT I think it's a distinguishing factor, you know, kind of sticking with how hard is it under the new political process. I think the chart that we have on page 17 of our reply brief explains that it's really easier to change race-based admissions policies now than it was before Section 26. And that's one basis. But I think the more fundamental basis is to say, you know, what Seattle is about. And if you can indulge me, I'm going to suggest that Seattle could mean one of three things. One of those, I think, you should clearly reject. And then the other two, I think, are possible interpretations that you could adopt. When Seattle talks about racial classifications, it focuses on laws that have a racial focus. Now, right out of the box, equal protection is about people, not about laws. But even more fundamentally, that cannot be the right test. At a minimum, that part of Seattle has to go. Because if you had a race-neutral law, like Michigan's Equal Protection Clause, which forbids discrimination on the basis of race or sex, you know, it mirrors the concept of the Federal Clause, that itself would be subject to strict scrutiny because it has a racial focus. So we know that can't be right. And that's Respondent's position. So that leaves you two other choices. And one would be an incremental change to this political restructuring doctrine. The other would be a more aggressive change. The incremental change would be to interpret racial classification in Seattle as meeting a law that, one, repeals an anti-discrimination provision, as it did in Hunter and Seattle, and, two, removes that issue to a higher level of the decision-making process. And because Michigan's law requires equal treatment, it eliminates preferences, not an anti-discrimination law. That would be a way that you could keep Seattle and Hunter as a viable doctrine and still go in our favor in this case. Sotomayor's Justice, I think, is that in the case of discrimination, busing could be viewed and was viewed to benefit only one group. There was a preference for blacks to get into better schools. That's the way the case was pitched. That was its justification. And to integrate the society. Affirmative action has the same aim. We've said that in Fisher. It should be to diversify the population. And so it favors diversity as opposed to desegregation. Right. But there's a difference between favoring diversity as an abstract concept on campus, which Grutter clearly allows, and remedying past discrimination, which was the point of the busing in Seattle. And that's why we're really in a post-Seattle world now, because under parent involvement. But there was no proof that there was any de jure segregation in Seattle? That's correct, because at the time of Seattle's decision, we didn't yet have parents involved, and so there wasn't a strict scrutiny test that was being applied to that busing program. And so you didn't have to go as far as you would today if you wanted to uphold that same busing program. But what really ties this case out. But you're saying there are three things. One, the first you reject. Yes. It can't be just a racial focus. Okay. And the second was an incremental improvement in the democratic process or democratic responsibility? That plus. Responsiveness, I guess. Right. That plus repealing an anti-discrimination law. I think that's the narrow way. Okay. And there was a third, did you say? Well, the third way is really to look at racial focus and say that's wrong and maybe this whole doctrine needs to be reexamined. And the way that you could do that is to look at what Seattle and Hunter are really doing, which is falling right into the Washington v. Davis line of cases. Both of those cases could have been resolved by saying, one, there's a disparate And, two, given the facts and circumstances in 1969 Akron, Ohio, and 1982 Seattle, Washington, that there was discriminatory animus based on race. And if you did that, you could reconcile those cases with Washington v. Davis and the entire line of equal protection jurisprudence this Court has used since that time. Now, that's important. But there is such a claim in this case. It just wasn't decided. Wasn't there a racial animus that the reason for Proposition 2 was to reduce the minority population? The court of appeals didn't get to that, but there was such a claim. There was a claim, but, Your Honor, there was also a decision. And the district court was really clear on this. Keep in mind that this was a summary judgment posture. And the district court concluded properly that there wasn't even a question of material disputed fact with respect to intent. This is at pages 317 to 319 of the supplemental appendix petition. And that's because the primary motivation for Section 26 included so many nondiscriminatory reasons, including the belief of some in Michigan that preferences are themselves race discrimination, others that race-neutral alternatives is actually a better way to achieve campus diversity that results in better outcomes for underrepresented minority students. Some could believe that the preferences result in mismatch, as Justice Thomas is saying. Kennedy, it seems to me, a good distinction for Hunter and Mulkey v. Reitman, which the briefs don't talk about. Yes. But not necessarily a distinction in Seattle, because in Seattle, you could argue, well, there are other methods that are less racially divisive. And I think — and I'd like to come back to Reitman, because that fits into this framework, too. But I think if you have any question about what Seattle really meant, the place to look is the later decision in Cuyahoga Falls, because in Cuyahoga, the Court specifically mentions, quote, the evil of discriminatory intent present in Seattle. That's at pages 196 to 197 of the opinion. And it also talks about the decisionmaker's statements as evidence of discriminatory intent in the Hunter case at page 195. And so I think if you look at Cuyahoga Falls, it's already done some of the work for you if you're going to take the more conservative route and say there's intent. But the argument would be any different here. One of the main sponsors of this bill said it was intended to segregate again. The voters in Seattle were not all filled with animus. Some of them just cared about their children not leaving — not having outsiders come in. I mean, there were — there's always voters who have good intent. That's true. And there's always some bad apples, too. We don't dispute that point. But here you have a district court holding that there's not even a material question of fact with respect to animus, because there are so many reasons that could be advanced, legitimate reasons, again, about mismatch and about the benefits of racial discrimination. Sotomayor In Seattle as well? So it wasn't the issue of animus that drove Seattle? I think it's much harder in Seattle, Your Honor. But, you know, to fit Reitman into this discussion, and, you know, what I would consider the more conservative way to deal with Seattle and Hunter, one that would be to think about how Reitman would come out under that test. In Reitman, of course, you had antidiscrimination laws, just like in Hunter, at the local level, which were then repealed by a State constitutional amendment. And the political restructuring doctrine had not yet been invented yet. And so what the Court did is it relied on the California Supreme Court's finding that there was discriminatory animus in striking down those antidiscrimination laws. I think that if you view Hunter and Seattle similarly as cases where if you repeal an antidiscrimination law as opposed to one that requires equal treatment, that's the narrow way to cabin those cases and ones that are a way that would allow those cases to survive, yet to distinguish Section 26. You know, one point that we haven't discussed much is the democratic process. And it's important that I emphasize that, you know, obviously the use of race-based and sex-based preferences in college education is certainly one of the most hotly contested issues of our time. And some believe that those preferences are necessary for campus diversity. Others think that they're not necessary and, in fact, that we would have a much better world if we moved past the discussion about race and instead based it on race-neutral criteria. But you can go back to the very first thing you said, because I didn't get your point. The question, what impact has the termination of affirmative action had on Michigan, on the enrollment of minorities in the University of Michigan? Do we have any clear picture of that, what effect the repeal of affirmative action has had? Yes, Justice Ginsburg, we have a muddy picture. As we explain in our reply brief, the first thing that we have is the actual statistics for the first full year after Section 26 went into effect. This is 2008. And what we find is that the number of underrepresented minorities as part of the entering freshman class at Michigan as a percentage changed very little. It went from about ten and three-quarters percent to about ten and eight-quarter percent. Then it gets very difficult to track, because following the U.S. Census' lead, in 2010, the University of Michigan stopped requiring students to check only a single box to demonstrate what their race or ethnicity was and moved to a multiple-check box system. And, Justice Sotomayor, when you see in the amici briefs that there's been a dramatic drop, for example, in African-American students on campus at the University of Michigan, those numbers don't take into account that people who before were forced to check a single box now could be checking multiple boxes. And if you fold in the multiple-check box students, the number of underrepresented minorities on campus actually comes out higher. Now, we don't know what those numbers are, because you could have a student who might be white and Asian, and they would not be considered an underrepresented minority, and they could be in there. But we know that the numbers are a lot closer than when you just look at single-check box students in isolation. Sotomayor. So what do we do with the statistics from California? An amici from California, their attorney general has shown in another State with a similar proposition, has shown the dramatic drop. Well, the statistics in California across the 17 campuses in the University of California system show that today the underrepresented minority percentage is better on 16 out of those 17 campuses. It's not at Berkeley. They haven't gotten there yet, but it's better on the rest. And by going to race-neutral criteria, what they discovered was that underrepresented minority students have higher GPAs, that they take more technology, engineering, and math classes, and they have a graduation rate that is 20 to 25 percent higher than it was before California's Proposition 209. You can see similar effects in Texas in their top 10 percent program before it was modified. And not only did it have those positive impacts, but it actually increased minority performance at socially, economically disadvantaged high schools, where the student said, hey, if I can only get into the top 10 percent of my class, I can be in the University of Texas at Austin. And, again, you know, we can all agree that diversity on campus is a goal that should be pursued. What the California and Texas experiences have demonstrated is that there are good, positive reasons why the voters might want to try race-neutral alternatives. So why is it okay to have taken away, not okay to have taken away the decision to have busing from the local school boards, the people on the ground, but it's okay to take that power away from the people on the ground here, the Board of Regents, who are also elected like the school board was in Seattle? The general population has feelings about many things, but the only decision that they are taking, educational decision that they are taking away from the Board of Regents is this one, affirmative action. Everything else they leave within the elected Board of Regents. You've put your finger on the fulcrum of Respondent's best argument, that only race as a factor alone has been removed. And there, their argument is exactly backwards, because it's not Michigan or Section 26 that single out race. It's the Equal Protection Clause itself. Because, Justice Sotomayor, if a student wants to lobby for an alumni preference or a cello preference and put it in the state constitution, strict scrutiny is never applied to that effort. But when you try to get a preference based on race or not based on race in the state constitution, strict scrutiny is always applied. And so it's the Equal Protection Clause which is making a differentiation between race and everything else. And that's why this Court in Crawford, again decided the same day as Seattle, at page 26, states on the basis of race and state action that addresses in neutral fashion race-related matters. And Section 26 falls into that latter category. Roberts. You've been asked several questions that referred to the ending or termination of affirmative action. That's not what's at issue here, is it? No. And I'm glad that you brought that up, Chief Justice Roberts, because affirmative action means a lot more than simply the use of race or sex-based preferences in university admissions. The Article 1, Section 26 only focuses on this one aspect of university admissions. Now, another important point to understand is that Section 26 is not all about university admissions. This is actually a much broader law that applies not just to race and ethnicity, but also to sex and to other factors, and that affects not just universities, but also public contracting and public employment. This was a broad-based law that was primarily motivated by the people of Michigan's decision to move past the day when we're always focused on race, exactly as Grutter invited the States to do. And you can see how that discussion gets mired when you look at some of these statistics that we've been talking about. Is someone who has multiple racial boxes checked more or less diverse than someone who only has one box checked? Is someone who comes from outside the country, say from Mexico? Sotomayor, you've done something much more. You're basically saying because Fisher and Grutter, we've always applied strict scrutiny. Correct. All right? So it's essentially a last resort within some reason. But what you're saying, if all those other measures fail, you're by Constitution saying you can't go to the remedy that might work. No, that's not what we're saying. Well, but this amendment is stopping the political process. It's saying the Board of Regents can do everything else in the field of education except this one. Well, again, it actually runs the other way, because equal protection is what singles out race-focused measures for strict scrutiny. But what we're saying is under Grutter, race preferences are barely permissible. It cannot be unconstitutional for the people to choose not to use them anymore, to accept this Court's invitation in Grutter to move past the discussion about race and into a race-neutral future. What would you do with a constitutional amendment that said pro-affirmative action laws, and only those, require a three-quarters vote of the State legislature? Well, under what we're going to call the narrow Save Hunter and Seattle, something like that would be unconstitutional because it removes an anti-discrimination provision and moves it to a higher level of government. Now, one of the problems with keeping that doctrine is that it could also work the opposite way. You know, pretend that the political climate in Michigan was turned on its head and the universities had agreed that they were no longer going to use race or sex in admissions, and then it was the State electorate, either in the legislature or in the Constitution, which imposed a Grutter plan on everyone. Well, under Hunter and Seattle, that would have to go because that law removes an anti-discrimination provision and moves it to the higher level. And so that would be one reason why you might want to take the Washington v. Davis approach and consider whether there's discriminatory animus based on race. But, you know, in either of those cases, I think you can either, you know, pare down the doctrine or get rid of it entirely and distinguish our case from it. But the one point that I want to leave you with today is that the core of Respondent's arguments that somehow a racial classification can be any law that has a racial focus cannot be the right test, no matter what that portion of Seattle and Hunter has to go, because equal protection is about protecting individuals, not about protecting laws. And even nondiscriminatory race-neutral laws that have a racial focus would fall under their racial focus test. You know, the hypothetical we give in our briefs on that, besides a State equal protection clause, would be the Federal Fair Housing Act, because it references race, it has a racial focus in the words of Seattle and Hunter, and it has the ability of preventing anyone from lobbying for preferences based on their race or sex at lower levels of the government, either State or local. So under their theory, the Federal Fair Housing Act would have to be applied under strict scrutiny. And their only response to that in the brief is that, well, the supremacy clause takes care of that problem, and we all know supremacy doesn't kick in until you first determine that the Federal law itself is constitutional, and it wouldn't be under their theory. So what we're asking you to do is eliminate that portion of Hunter and Seattle that suggests that a law's racial focus is the sine qua non of a political restructuring doctrine test, and to either — Ginsburg. Yes. Ginsburg. Mr. Burke, isn't the position that was taken in Seattle derived from a different view of the equal protection clause? I mean, strict scrutiny was originally put forward as a protection for minorities — a protection for minorities against hostile, disadvantageous legislation. And so the view then was we use strict scrutiny when the majority is disadvantaging the minority. So you do, under the Caroline Products view, you do focus on race, and you ask is the minority being disadvantaged. If that were the view, then I suppose we would not be looking at this, well, the criterion is race, and wherever the disadvantage falls with a majority or minority, it's just the same. That wasn't the original idea of when strict scrutiny is appropriate. So if we were faithful to that notion, that it is measures that disadvantage the minority, they get strict scrutiny. Well, two thoughts on that, Justice Ginsburg. First, under Grutter, this Court made crystal clear that a Grutter plan is not about which minority group is being advantaged or disadvantaged. It's supposed to benefit the campus as a whole. And to the extent the claim is that preferences benefit certain classes of minorities and not others, you know, for example, it benefits African-Americans and Latinos, but not Asians, even though they're both discreet and insular, underrepresented groups, that then it fails under Grutter. It can only be something that benefits everybody. But more fundamentally, going back to your question about the origin of the doctrine, I think it's really important to understand why we have Hunter, because Hunter, remember, was decided before Washington v. Davis. And when you look at the face of the law in Akron, Ohio, in Hunter, there's nothing in there that would trigger strict scrutiny. And so this Court was searching for another way to strike down a law that removed an anti-discrimination provision and made it more difficult to reenact at the higher level of the political process. It needed something to fix that. And our point is, you can either construe it to do exactly that, that only anti-discrimination laws being struck down and moved to a higher level can satisfy a political restructuring doctrine, or you can look at it differently. You can say, now that we've got Washington v. Davis, and we all know what the intent was in Akron, that that is a simpler way to address this problem, and we really don't need the political restructuring doctrine at all anymore. But the reason why we have the doctrine in Hunter is because strict scrutiny did not apply. You said that the district court found it was clear that there was no discriminatory intent, but that wasn't reviewed on appeal. No, it was not. But it wasn't a finding. It was actually more than that. It was at the summary judgment stage. The district court correctly concluded there wasn't even a question of disputed material fact as to whether intent was the primary motivation of the electorate. Unless there are any further questions, I will reserve the balance of my time. Thank you, counsel. Mr. Rosenbaum. Mr. Chief Justice, and may it please the Court, let me begin, Justice Kennedy, with the questions you raised and then come to the question that Chief Justice Roberts raised. To begin, Justice Kennedy, there is no way to distinguish the Seattle case from this case, nor the Hunter case. Both those cases have to be overruled. Here is why the Seattle case is identical to this case. Both cases involve constitutionally permissible plans which had as their objective obtaining diversity on campuses. Seattle was a K-12 case. This case is a higher education case. But in both instances, the objective was to obtain diversity. No constitutional mandate to relieve past discrimination. Rather, in fact, as the Court said, Seattle, Tacoma, and Wasco were attempting to deal with de facto segregation. It's not an accurate description of Seattle. I thought that in Seattle, before the school board adopted the busing plan, the city was threatened with lawsuits by the Department of Justice, by the Federal Government, and by private plaintiffs, claiming that the previous pupil assignment plan was unconstitutional and involved de jure segregation. Isn't that correct? That's correct with respect to at least one of the districts, Justice Alito. But in terms of the program itself, there is no dispute that it was done pursuant to a plan for de facto segregation. Moreover, the question you asked, Justice Kennedy. Alito, I don't understand the answer to that question. As to Seattle itself, is it not the case that they were threatened with litigation? Yes, but there had been no finding, Justice Alito, of de jure segregation. And isn't it correct that the district court found that there was de jure segregation? That is not correct. There was no finding whatsoever that there had been de jure segregation and that there was a constitutional imperative to correct that desegregation. It was absolutely identical to the situation. And regarding the accountability, Your Honor is correct that in Seattle what we were dealing with was an elected school board. And here, as the Michigan brief says, as the Wayne State brief says, as the Court specifically found at pages 326A and 327A of the record, this is a political process in which the regents were elected, have at all times maintained plenary authority over the admissions process itself. And that there are two things. Number one, is it delegated to the faculty. And number two, their election, they're elected only rarely and in staggered terms. That — there's no question that that's correct, Your Honor. But the ordinary process itself is a politically accountable process. That's what the district court found when it looked at how the system worked. And in fact, the— What if the board delegated to the various universities the authority to develop their own admissions programs? Couldn't alter. I'm sorry. I'm sorry. They did. And then after several years, they decided, you know, we don't like the way it's working. They're adopting too many racial preference programs. We're going to revoke the delegation. Absolutely fine. Why is that any different? Because the difference is that in the Seattle case, in this case, and in the Hunter case, what's going on is a change from the ordinary political process, which Your Honor perfectly described. They can change it today. They can go to an affirmative action plan today, repeal it tomorrow. So if there were a provision in the Michigan Constitution that says the board of regents is authorized to enact these programs, in other words, delegated from the people in the Constitution to the board, and then the people change the delegation by saying no, it's no longer, we're no longer going to leave that up to the board. We're going to make the decision ourselves in the Constitution. How is that any different? It is different, Your Honor, because of the racial nature of the decision. Under their theory, under their theory, the people of the State, of a State, could put in the legislature two rooms, one for racial matters, one for all other sorts of matters, and say to any entrant who wants to enter that first room, you may do so. But first you have to pay an exorbitant cover charge, and then you have to mount multiple flights of stairs just to begin the process of enacting constitutionally permissible legislation. Or think about it in the desegregation case. A student comes in. Two students come into the admissions committee. One says, and the admissions committee says, we have one question for you, one question for you since you're here to talk about a legitimate, a legitimate factor in pursuit of diversity. Here's the question. Do you want to talk about your race, your race, in the context of other factors? And if the answer is yes, that student is shown the door, told go raise between $5 and $15 million, repeal Prop 2, and then you can come back to make, make the case. Whereas the student who says, no, I've just got another legitimate factor, maybe geography, maybe alumni confections, connections, whatever that is, that person is permitted to make the case. It is a racial distinction. Now, Chief Justice Roberts, you're certainly on to something in terms of are there race-neutral methods to get this done? Of course there are. The State constitution itself could be altered so that a different committee or a different set of individuals could make the decision if they don't like the way the regents are doing it. Or they could do it the old-fashioned way, the way that the political accountable system works, which is to say we are going to work at these universities. That's how affirmative action involving race happened in the first place. That's at pages 270 to 271a and 282a to 293a. They worked for years to make that happen. Well, I thought the whole purpose of strict scrutiny was to say that if you want to talk about race, you have a much higher hurdle to climb than if you want to talk about something else. Now, you can argue that strict scrutiny should only apply to minorities and not to students who are not minorities, but I thought the Court decided that a long time ago. Exactly. So I don't know why that's a hard question that you ask about the student who says I want to talk about race. What if it's a white student who comes in and says I want to talk about race, I'm white, and therefore you should admit me, you should give me preference. The State can't say no, we don't want to hear that? The State can say we don't want to hear that, whether it comes from a white person, a black person, whomever, if in fact they are not doing it on a race-specific basis. You're exactly right, of course, about strict scrutiny. And the programs in this case, indeed the only programs in this case that are effective are those that have passed strict scrutiny. Well, I don't understand your answer then. If the student, one student comes in and says I want to talk about how well I play the cello. All right, we'll listen to that. I want to come in and talk about why I as a white person should get a preference. You have to listen to that because you're listening to the talk about the cello, too? You do, Your Honor, when the program has passed the strict scrutiny test that we're talking about. And that's the only sort of program that is at issue in this case. Of course you're correct. If it is a Gratz-type program, if it's unconstitutional, if it's a quota system, you don't have to listen to anybody talk about race. But we are only dealing with constitutionally permissible programs. Why it is impossible, impossible to distinguish Seattle. And his argument about Hunter, page 389 of the Hunter decision is the reason Hunter was decided. It's not a Washington v. Seattle. Kennedy. Well, I'm not sure I understood the answer you gave to the Chief Justice hypothetical. Maybe I misunderstood the hypothetical. Suppose the Board of Regents have a rule, it's written, it's a rule, that the faculty makes a determination of whether there should be affirmative action. Yes. Five, and the faculty votes for affirmative action. Three years later, the Board of Trustees said, we're abolishing the rule, we're doing that ourselves. Violation? Assuming that the Regents say that's fine, no problem whatsoever. No problem whatsoever. That's the ordinary political process. So the Regents can take it away from the faculty. The Regents have plenary opinion. But can the legislature take it away from the Regents? Not under the Michigan Constitution, because the Michigan Constitution No, no. Hypothetical case. Okay. Under who's got the authority here? The legislature can take it away. That's not a problem in a situation where that's part of the ordinary process. But then the voters can't take it away. At what point is it that your objection takes force? I just don't understand. Where there is I don't understand the declension here. My apologies, Your Honor. Or the crescendo, whatever you call it. Both are music to my ears. The point, Justice Kennedy, is that the people of the State have multiple options available to them if they don't like the way the universities are operating. But the one option they don't have is to treat racial matters different from all other matters. The example that you gave That applies in the Chief Justice's hypothetical or my revision of it as between the Board of Regents and the faculty, or between the faculty and the legislature. Exactly. And the problem, the problem that the restructuring process gets at, because of the particular concern that this Court has shown with respect to the political process, that the political process itself not become outcome determinative, that the political process itself be a place where we can air these discussions, but not create it in a separate and unequal way to make the, to actually make the decision itself through the process. Why is the faculty administration, faculty decision, any less outcome determinative than what the voters would say? I think there would be people that might disagree with your empirical assumption. Then I'm not explaining it clearly. The first, when the faculty makes the decision, Justice Kennedy, that's part of the ordinary political process. Nobody is allowed to win all the time. No one has to win all the time. No one has to lose all the time. Whatever it is, it is. That's the ordinary political process. That's how we use the political process. The problem with mounting a racial classification within the Constitution itself is that then that takes the ordinary political process to the extraordinary political process. Roberts. Certainly you could say that the whole point of something like the Equal Protection Clause is to take race off the table. Is it unreasonable for the State to say, look, race is a lightning rod? We've been told we can have affirmative action programs that do not take race into account, socioeconomic diversity, elimination of alumni preferences, all of these things. It is very expensive. Whenever we have a racial classification, we're immediately sued. So why don't we say we want you to do everything you can without having racial preferences? Now, if the litigation determines that we're required to have racial preferences, this statute has an exception and allows them. But starting out, we want to take race off the table and try to achieve diversity without racial preferences. The problem, Your Honor, as this Court stated as recently as last term in the Fisher case, is that under the Equal Protection Clause, race is not all the way off the table. And the problem with Proposal 2 is that the substance and the message that it communicates is that because of the separate and unequal political track that is created with respect to the extraordinary steps that have to be taken, the message is that even where race is being utilized as one of many factors in a constitutionally permissible way, the message that is being communicated is that all uses of race are illegitimate, all uses of race are off the table, that race itself is a dirty word. Scalia Why doesn't the Fourth Amendment violate the rule you're saying? The Fourteenth Amendment violate the rule that you're proposing? I mean, I'm a minority, and I want laws that favor my minority, not just in the university, everywhere. My goodness, I can't have that through the normal legislative process. I have to get a constitutional amendment to do it, right? That is correct, Your Honor. Scalia Well, so I guess that on this subject of equal treatment of the races, we can eliminate racism just at the legislative level, can't we? Your Honor, the underlying basis of the entire scrutiny doctrine in the Fourteenth Amendment is to preclude the government, preclude the legislative and the executive branch from making those determinations as absolute determinations. The Fourteenth Amendment sets the standards and the criteria by which we measure that. Of course you're correct. That's what the Fourteenth Amendment does. It sets what the rules are in terms of how race is utilized. But what the Grutter case said. Scalia You can't change those rules by normal legislation. That is correct. And if you're a minority that wants favored treatment, you're just out of luck. You have to use the ordinary political process, and that's all we're saying. Scalia No, but the constitutional amendment is not the ordinary political process. But the fact that it's a State constitutional amendment underscores my argument, which is that in order for the minority or any individual, and white minority, whatever the individual is, to say I want the same rulebook, I want the same playing field, the problem with Proposal 2 is that it creates two playing fields. Alito If Proposal 2 had been in the Michigan Constitution before any affirmative action program was adopted, would the result be the same? Scalia It would, Your Honor, because it would be building in this explicitly facial racial classification into the State constitution. The problem are the separate and unequal systems that are being used to deal with race, and separate and unequal under the Fourteenth Amendment shouldn't come within 10 feet of race. Scalia It's not a racial classification. You should not refer to it that way. It's the prohibition of racial classification. Every prohibition of racial classification is itself a racial classification. Alito No, Your Honor. The problem with Proposal 2 is that it's just as in Hunter, just as in Hunter. It is an explicitly facial racial classification. It singles out race for different treatment. My goodness, this was born, this campaign started three days after Grutter itself. The author said the purpose of it was to get rid of racial preferences. Scalia Well, if that's how you're using racial classification, I thought it meant, you know, it's directed at blacks or Asians or no. Alito No. Scalia In that sense, the Fourteenth Amendment itself is a racial classification, right? Alito Well, that's the standard. Scalia In that sense, the Fourteenth Amendment itself is a racial classification. Alito I don't agree with that, Your Honor, because I'm measuring it as a racial classification by the Fourteenth Amendment, and that comes back to Justice Ginsburg's argument. His argument, his revisionist history of Hunter, his — was about motive. But, Your Honor, that had nothing to do with the problem in this case. When the Court looked at — when the district court looked — may I finish my answer, Chief Justice Roberts? Roberts Yes. Alito When the Court looked at this particular issue, the concern was the way that it racially divided the political process itself. What he is saying is that, well, there may be all sorts of motives. That's a rational basis test, and that has nothing to do with the racial classification. The definition I'm using, Justice Scalia, is this Court's definition of a racial classification for which all sorts trigger strict scrutiny. Roberts Thank you, counsel. Ms. Dreyer. Dreyer Mr. Chief Justice, and may it please the Court, we ask this Court to uphold the Sixth Amendment, to reaffirm the doctrine that's expressed in Hunter, Seattle, and to bring the Fourteenth Amendment back to its original purpose and meaning, which is to protect minority rights against a white majority, which did not occur in this case. Scalia My goodness. I thought we've held that the Fourteenth Amendment protects all races. I mean, that was the argument in the early years, that it protected only the blacks. But I thought we rejected that. You say now that we have to proceed as though its purpose is not to protect whites, only to protect minorities. Dreyer I think it's a measure that's an anti-discrimination measure. Scalia Right. Dreyer And unless that exists, the Fourteenth Amendment is not violated. Is that right? So if you have a banding together of various minority groups who discriminate against whites, that's okay? Do you have any case of ours that propounds that view of the Fourteenth Amendment, that it protects only minorities? Any case? Dreyer No case of yours. Breyer Some people think that there is a difference between the plus and the minus. So judges differ on that point. Some agree sort of with you, and some agree sort of not. All right? Let's think of those who agree sort of. Then I have a question, and you know this area better than I. So think of Grutter. Grutter permits affirmative action. Think of the earlier cases. They permitted affirmative action where it was to overcome the effects of past discrimination, but probably not otherwise. Now, that's what I want to know. Are there areas other than education where affirmative action would not be forbidden to achieve a goal other than overcoming the effects? Have you got the question? And does an answer come to mind? I think that affirmative action programs could be permissible under employment, for instance. Okay. So there are a set. That's right. If there are a set, what I would like you to explain, if you can take a minute, is think of how a city is set up. There are a vast number of administrators. There are a vast number of programs. It could be an administrator somewhere says he would like to give a preference, maybe for good reason. But then the city council votes no, because there are other ways of doing it by, you know, first come, first served or some other criteria that doesn't use race. Are all of those unlawful? Every one? Do you have to leave it up to the no matter what the subject, no matter what the or are you going to draw a line somewhere? Is there a line that you could draw that would take your case on the right side from your point of view, but would say we are not giving power to every administrator in the city to decide on his own whether to use racial preferences without a possibility of a higher-up veto, which I don't think you want to say, but maybe you do? No. I think these are very fact-based determinations. And so somebody could make a decision that they wanted to use what you are calling racial preferences, and that could mean a range of things, and that could be subject to a veto, higher-up. Yes, I agree with you. So what's the line? Is there any line that you can say, look, here, we were trying to be very helpful, and all of a sudden they put this thing on the ballot, you can't even get it through. Okay? That's your basic point. But if you think of you have to write something, and that something has tremendous effect all over the place. So what kind of line is there in your opinion? I think Hunter Seattle provides a line. I think it says that if you have a law that has a racial focus and that law, part of proving that it has a racial focus, is that it takes a benefit that inures two minorities, and it removes that benefit, and it restructures the political process and places a special burden on minorities to re-ascertain that right, yes, I think that's a proper rule. Can I come back to the question that the Chief Justice and Justice Kennedy were asking before, essentially their question? Let's say that the decision about admissions criteria across the board is basically delegated to the faculty, all right? And the faculty adopts some sort of affirmative action plan. And now that is overruled in favor of a colorblind approach at various levels going up the ladder. So maybe it's overruled by the dean, maybe it's overruled by the president of the university, maybe it's overruled by the regents, maybe, if State law is allowed, it's overruled by an executive department of the State, maybe it's overruled by the legislature through ordinary legislation, maybe it's overruled through a constitutional amendment. At what point does the political restructuring doctrine kick in? I think in this case the difference between what other groups can do in order to get preferential treatment for their sons and daughters and what racial minorities are subject to, the level of distinction places such a high burden on minorities. Well, that really isn't responsive to my question. Let's say exactly what was done here is done at all of these levels. At what point does the doctrine kick in? When it goes from the faculty to the dean, from the dean to the president, et cetera, et cetera. Where does this apply? I think it depends on where it is that minorities face a heavier and special burden. It can't be that, because the normal political process imposes burdens on different groups. I thought the line was a very simple one, which is if the normal academic decision making is in the dean, the faculty, at whatever level, as long as the normal right to control is being exercised, then that person could change the decision. So if they delegate most admissions decisions, as I understand from the record, to the faculty, but they still regularly, besides race, veto some of those decisions and race is now one of them, then the Board of Regents can do that normally. So could the president, if that's the way it's normally done. It's when the processes, political processes change, specifically and only for race, as a constitutional amendment here was intended to do, that the political doctrine is violated. Have I restated? You have. You've restated it very well, and I agree with your explanation. But I still don't understand your answer to Justice Alito's question. Suppose the dean has authority in the bylaws of the university to reverse what the faculty does, but you have a dean who just does not like affirmative action. He's dead against it. And he makes the decision to reverse the faculty. Do you have a remedy? I don't think it's — I don't think Hunter-Seattle applies. All right. Then — then you have Justice Alito's question. Then it's the president of the university. Then it's the — then it's the legislature. I think you need two things. I think you need the decision-making — the decision-making body. If the University of Michigan Regents decided tomorrow to eliminate affirmative action programs and there was no Prop 2, they have the legal right to do that. They are the decision-making body. And minorities still could go and lobby the regents, still could go and — and talk about the questions of racial inequality and different — But would that be true if they — I'm sorry. Would that be true if they had never gotten involved in admissions criteria before? They had the authority, but they left that to the university officials. I think if they have the plenary authority to do that, yeah. I think that — that, again, if they wanted to eliminate affirmative action programs and they had that plenary authority and it was guaranteed by the Michigan State Constitution and it had existed for 150 years and they chose to enter this area, I think they have — I don't see how that's — how that is consistent with Justice Sotomayor's answer to my question. Don't the people of Michigan have — don't the people of Michigan have plenary authority? In this case, the particular — it's — they're applying that plenary authority in — or in a way that is racially focused and creates a political process that is disadvantageous to my question. What about saying instead of political process? Now, don't let me put words in your mouth. Think what you think here. You say where the authority was divided in a certain way. And that's true under the Constitution of the State. So the State government lacks the power. And then you have to take the power from the people and change the Constitution. And when you do that in respect to a benefit, then, in respect to benefits, Washington — you know, Seattle and Hunter kick in. So you're not dealing with past discrimination. Well, this was — this — what we're talking about in terms of affirmative action are constitutionally permissible programs that were shown to this Court to be the only way to achieve racial diversity and integration at the University of Michigan. And whether you — whether you explain that by looking at the reality of the inequality in education for black and white Michigan or whatever it is that you come up with that requires that, the university has shown that this is the only way to achieve diversity in which racial diversity is a part of the — is a part of the quotient. And so to take away that right from the university and from the regents — and I just want to go back to one of the questions that was answered. If you look at the law schools, the medical schools, the professional schools now in the state of Michigan, there's been a precipitous drop in underrepresented minority enrollment in those schools. We are going back to the resegregation of those schools because of the elimination of affirmative action. To what extent does your argument depend — and I thought both Hunter and Seattle speak in these terms — that the policies that are more difficult to enact are beneficial for the minority group? Say that — I'm sorry. To what extent does your argument depend upon the assumption that the programs that you say are now more difficult to enact are beneficial to the minority group? I think it's an important component part because I think it's — it's — it's in the benefit to the minority group that it's especially important that the political process be on a level field. Right. What if the question of whether it's a benefit to the minority group is more open to debate, whether it's through the mismatch theory that Taylor and Sander, I guess, have adopted or other theories? Do we have to assume in your — in your favor that these definitely are beneficial to particular minority groups? Certainly the minority voters of Michigan believe them to be because 90 percent of black voters in Michigan voted against Prop 2. And I think that that's a clear indication of the popularity of these programs and the perceived benefit of these programs. There's a difference. There may be a difference between popularity and benefit. In other words, you want us to assume that the programs are beneficial to the minority group. Yes. And they are beneficial to minority groups. They may — they may serve to provide benefits for the population beyond minority groups, but they are a benefit if they — Your opponent says otherwise. He says that minority students have taken tougher courses. They have been better qualified to be admitted and all sorts of other benefits. So, you know, it's certainly a debatable question. It's a debatable question in another forum in a different case. And, in fact, I think that case was the Grutter case. This case isn't about — isn't just about whether or not affirmative action benefits minorities. It's also the restructuring of the political process and the special burden that's placed on minorities. It's not — if you want to go back to debating the, you know, whether affirmative action — You're changing your answer, then. Your answer to the Chief was it does depend upon whether it benefits minorities. Now you're saying it doesn't depend on whether it benefits minorities at all. It's just whether it places a greater burden on minorities to change it. Which is it? One or the other. I think it's a two-part test. I think the first — the first thing that you look at is, is there a racial focus to the law, and is the benefit that has been taken away something that inures two minorities. And I think the second part of the test, and that's why I think Seattle Hunter is such a narrow doctrine, is whether there also has been a restructuring of the political process and a special burden placed on minorities. It requires both. Thank you, counsel. Mr. Bush, you have four minutes remaining. Thank you, Mr. Chief Justice. I'm going to start with a sentence from Crawford decided the same day as Seattle where this Court defined what a racial classification is. A racial classification either says or implies that persons are to be treated differently on account of race. It doesn't say anything about laws with or without a racial focus. And we think that's the test that ultimately should come out of the decision in this case. Now, my friends on the other side disagree with that, because if that's the test, Section 26 is constitutional. And so they draw this false dichotomy between laws that involve race and laws that don't involve race. We'll put them in two separate chambers of the legislature and charge a fee if you want to talk about race. And we know that can't be right because of, Chief Justice Roberts, your observation that the whole point of equal protection is to take race off the table when everyone is being treated the same. That's why they can't be treated the same. You quoted from Crawford. Yes. There is an opposing quote in Seattle itself on page, what is it, 486? Yes. When the State's allocation of power places unusual burdens on the ability of racial The governmental action seriously curtails the operation of those political processes ordinarily to be relied on to protect minorities. And it quotes Caroline Products. So, and then the following sentence is, in the most direct sense, this implicates the judiciary's special role, not of treating individuals as individuals, but the judiciary's special role in safeguarding the interests of those groups that are relegated to a position of political powerlessness. So the rationale of Seattle is that notion that you can't put hurdles in the way of a disadvantaged minority. Justice Ginsburg, there's two problems with that. First, that's where the Respondent's theory most closely knocks up against Grutter, because you're right. Under Seattle and Hunter, you've got to have a policy designed for the purpose of primarily benefiting the minority. But if that's the policy, it violates Grutter, which is supposed to benefit everyone. But the bigger problem is if you treat that as Diversity does. But when you take away a tool for diversity, that's what Seattle is saying is wrong. Right. But the bigger problem You take the tool away simply because it may include race as a factor, simply because you're changing the playing field. But, Justice Sotomayor, the biggest problem with Respondent's test, with applying the literal language of Seattle, is that, as I said, the Federal Fair Housing Act, the Equal Credit Act, a state equal protection law that mentions race, all of these things fall in the category of laws dealing with race. Some are discriminatory. Seattle, in this case, both involve constitutional amendments. So why can't the law be drawn, the line be drawn there? If you change the allocation of power in one of these less substantial ways, that's one thing. But when you require a constitutional amendment, that's really a big deal. Because that would still invalidate the Michigan Equal Protection Clause, which has a racial focus. It says you cannot discriminate based on race or sex. And yet no one would argue it should be subject to strict scrutiny. Breyer's acceptable treaty.      Breyer's acceptable treat. Breyer's acceptable treaty. But that's the benefit of the minority group. What I'm thinking is, go read the cases. You, yourself, seem to say. These cases seem to apply alike to the benefits or to the discrimination against it. I mean, there's lots of language in Seattle. You come in and out. Now, suppose you take that and say, all right, it was meant in context, but the context includes constitutional amendments. Because with the constitutional amendment, you are restructuring. Now, you'd lose on that theory. But there would be a limitation on the extent to which the people have the right to move powers around. Justice Breyer, the limitation has to be not only that, but also that you're repealing an anti-discrimination law, not an equal treatment law, where, again, otherwise the State Equal Protection Clause has to fall. So to the extent that I'm right, that's a way that you can narrow Hunter in Seattle and Section 26 has to survive. If I'm wrong about that, then respectfully, Seattle and Hunter should be overruled. Either way, it does not violate equal protection to require equal treatment. Thank you. Roberts. Thank you, counsel. Counsel. The case is submitted.